UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | DEFENDANT'S SENTENCING MEMORANDUM |
| - against - | : | |
| TERRENCE WILLIAMS, | : | **21 Cr. 603 (VEC)** |
| Defendant. | : | |

-------------------------------------------------------------X

## SENTENCING MEMORANDUM
## FOR TERRENCE WILLIAMS

David Stern
Rothman, Schneider,
        Soloway & Stern, LLP
*Attorney for Terrence Williams*
100 Lafayette Street, Ste 501
New York, New York 10013
(212) 571-5500

**Introduction**

Terrence Williams is scheduled for sentencing before your Honor on July 24, 2023 at 2:30 PM, following his plea of guilty to Counts One and Two of a Third Superseding Indictment charging him with Conspiracy to Commit Health Care Fraud and Wire Fraud and Aggravated Identity Theft.

Mr. Williams is a 36-year-old man whose early life was shaped by poverty, drug addiction, abuse, parental absence and instability. Both of Mr. Williams's parents were incarcerated when he was a young child, and when he was six years old, his father was murdered before making it home from prison. Remarkably, Mr. Williams avoided following in the footsteps of his many family members who sold crack cocaine to support themselves. Instead, he became an accomplished basketball player, playing in college, the National Basketball Association for four years, as well as two years internationally. Throughout that time he supported his mother, siblings and children. Unfortunately, Mr. Williams's professional basketball career was derailed by multiple injuries and ultimately, what would become his seven-year addiction to Percocet, which contributed to his involvement in the instant offense.

However, Mr. Williams is more than the offenses he committed in this case. He is also the loving and supportive father of six children and a loving partner to his girlfriend, Paris Ramsey. He has the support of several family and friends who believe that he will be a law-abiding citizen upon his release from custody.

Since his remand on May 6, 2022, Mr. Williams has endured fourteen months of uniquely restrictive and harsh conditions at the Brooklyn Metropolitan Detention Center, and has incurred no disciplinary infractions while in custody.

In light of the factors discussed herein, as well as comments to be made at the time of

sentencing, it is submitted that the requested sentence of 50 months' imprisonment is sufficient but not greater than necessary to promote the statutory goals and purposes of criminal sentencing provided under 18 U.S.C. § 3553(a).

### The Presentence Report and Advisory Federal Sentencing Guidelines

Mr. Williams and I have reviewed the revised Presentence Report dated January 27, 2023 prepared by Probation Officer Christopher Paragano and Mr. Williams has no objections.  Additionally, Mr. Williams agrees with Probation's calculations of his Offense Level, which reflects that set forth in his Plea Agreement with the government; that is: a base offense level of 7, an eighteen-point increase based on an intended loss amount of $5,000,000, an additional two points because the offense involved the use of sophisticated means, an addition of four points for Mr. Williams's leadership role, and the addition of two points for obstruction of justice, resulting in an adjusted offense level of 33, and a three-point reduction for acceptance of responsibility, resulting in a total offense level of 30. (PSR ¶¶ 7, 154 – 64). Mr. Williams also agreed to one criminal history point based on a prior conviction for reckless driving in 2019.  (PSR ¶¶ 7, 166). Probation has added two points to Mr. Williams's criminal history score pursuant to U.S.S.G. § 4A1.1(d) because the instant offense was committed while Mr. Williams was on unsupervised probation. (PSR ¶ 168). Thus, Probation calculates three criminal history points and a Criminal History Category of II.  (PSR ¶ 169). A criminal History Category of II and an Offense Level of 33 yields an advisory Guidelines range of 108 – 135 months on Count One.

Pursuant to the Plea Agreement, which affords Mr. Williams only one criminal history point and places him in Criminal History Category 1, the Plea Agreement calculates Mr. Williams' guidelines range for Count One is 97 – 121 months' imprisonment. However,

because Count Two carries a mandatory minimum sentence of 24 months' imprisonment, which must run consecutively to the sentence imposed on Count 1, the stipulated Guidelines range in the plea agreement is 121 to 145 months.

Probation recommends 84 months' imprisonment – 60 months' imprisonment on Count One, followed by a consecutive term of 24 months on Count Two – based on the mitigating factors in Mr. Williams's life, including his "difficult upbringing, substance abuse disorder, and familial obligations." (PSR at 52, 54). We agree with Probation that a variance is appropriate. However, it is respectfully submitted that a sentence of 50 months' imprisonment is sufficient but not greater than necessary to achieve the objectives of federal sentencing.

### Personal History and Family Circumstances

Throughout this case, Terrence Williams has had the support of his family and friends. Attached as Exhibit A are letters from those close to Mr. Williams describing the type of man that they know him to be. *See* Exhibit A.

In a letter to the Court, Terrence's girlfriend and life partner, Paris Ramsey, describes him as a loving and committed father, son and brother who has provided for his family and has become a person that his family and friends can depend on. *See* Ex. A. She states, "coming from humble beginnings, making it to the NBA gave [Terrence] the ability to provide for his family, not just his children, but his mother and siblings." Ex. A. Paris and Terrence share a one-year-old son, and although he was eight months old when Terrence was remanded, she notes that he resembles Terrence's mannerisms and characteristics, and lights up when he hears his father's voice on the phone or sees his face in pictures. *Id*. Paris further states, "[w]e hope that their time apart isn't much longer so they can continue to build upon their bond and Terrence can teach him

all the things a father should. The things he wished were taught to him when he was younger that would have equipped him to have integrity, be smart, and make good decisions." *Id*.

Terrence's sister, Deshire Turner, has also written to the Court. She states that although Terrence was only a year older than her, "in terms of the influence he's had on my life he might as well has been my father." Ex. A. She states that in addition to raising his own children, Terrence served as a father figure to Deshire's son, and "has always been an essential part of [his] life by providing guidance and support of that of a good father figure." *Id*. Deshire acknowledges her brother's mistakes and his remorse for his actions in this matter. *Id*.

Terrence's former high school basketball coach, Robert Delgardo describes him as "a young man that is very intelligent, respectable, responsible, and sometimes misunderstood." Ex. A. He knows that Terrence is remorseful for his actions, and feels "[t]his mistake does not define him as the person I know", promising the Court "that [Terrence] will never be in a position like this again." *Id*. Mr. Delgardo is hopeful that Terrence can turn his life around and will become a better person for himself, his family and his community. *Id*.

Darryl Hennings, a senior athletic director for the Rotary Boys and Girls Club of Kings County, Washington has known Terrence since he was a young child. He writes:

> Through my occupation … I have been fortunate to encounter a handful of kids that have stood out from the rest in regard to personal character, self-discipline, talent and just being a good person. Terrence is one of the individuals that I would categorize as such … Though he was a little rough around the edges, Terrence was always held in high regard by his peers and the adults he encounters. He was well liked and the community wrapped his arms around him, in an attempt to assure that his talents wouldn't go unseen.

Ex. A.  Mr. Hennings has since watched Terrence evolve into "a great father and someone who cares about his community." *Id*.  He believes Terrence's actions in this matter were the result of poor judgement, and "is the exception, rather than the rule for how this young man lives his life."

*Id*.

Daniel Jurdy, Terrence's high school athletic director whom Terrence lived with during high school has also written a letter to the Court. He states, "I know Terrence and he is one of the kindest young men I have had the pleasure to work with and have been a part of my life. In 36 years in education I have watched him help many kids and adults during his rise in the NBA and even during high school and college when he had nothing." Ex. A. Mr. Jurdy notes that most of the money Terrence earned throughout his NBA career went to helping others while there was never anybody to help him during that time. He believes that Terrence has learned his lesson in this matter and "will be an amazing part of society if given a second chance." *Id*.

Additional letters from family and friends are also included hereto and express similar sentiments describing Terrence as an excellent father who has worked hard and given back to others. Similarly, these writers have faith that Terrence will be able to turn his life around and they will be there to support him throughout that process.

### *Early Childhood*

Born in 1987 in Seattle, Washington to Edgar Williams and Sherry Jackson, Terrence Deshon Williams spent the early years of his life in the care of different relatives while both of his parents were incarcerated. Terrence's father was a member of the Bloods street gang.  When Terrence was a baby, his father was convicted of murder and sentenced to prison. Terrence only visited his father on two occasions during his incarceration.  A few years later, Terrence's mother was convicted of drug distribution and sentenced to prison as a result of helping her father sell crack cocaine to an undercover police officer outside of their home.

In 1993, when Terrence was six years old, his father was released from prison. Terrence recalls feeling excited to be reunited with his father, whom he had not seen in years. Tragically,

before Terrence could see his father, Edgar was murdered by his friend and co-defendant in his criminal case who had picked him up from the prison. The killing was in retaliation for Edgar talking to law enforcement about his criminal case. Terrence was devastated, and with his mother still in prison at the time, he had nobody to turn to for emotional support as he grieved his father's death.

Thereafter, with neither parent in his life, Terrence was sent around to live with various relatives, including his maternal grandparents, aunts and uncles. At seven years old, Terrence was sexually abused by a caregiver on more than one occasion. He never informed anyone of the abuse. He neither received any form of counseling for the sexual abuse nor for his father's murder or his mother's incarceration. Instead, Terrence tried to cope with these traumatic events on his own, an impossible feat for a young child.

After Sherry was released from prison, Terrence resided with his mother, his sister, Deshire Turner (now age 34) and younger brother, Demicko Chapman (now age 30).  Deshire's father also sold crack cocaine, and Demicko's father was in and out of their life. The next several years were chaotic as Terrence and his family continued to move around to different homes with different relatives. Terrence never knew why the family continuously relocated. They subsisted on public assistance and at times had no electricity.  At one point Terrence was living with fourteen people in a three-bedroom home.  Terrence's grandfather and uncles sold crack cocaine to support themselves and were also addicted to the drug. Terrence observed their drug use and drug dealing as they stashed crack cocaine in the home. Terrence recalls the police raiding and searching his home on several occasions.

During this time, Terrence's mother was in a relationship with Demicko's father, also named Demicko Chapman. Mr. Chapman was in and out of prison and was emotionally and

physically abusive towards Sherry, which Terrence witnessed. On several occasions Sherry sustained serious physical injuries from the abuse. Terrence specifically recalls a time when both of his mother's eyes were swollen shut after getting beaten by Mr. Chapman. Terrence explained to probation that he hated Mr. Chapman for abusing his mother, and he developed deep anger towards his uncles who witnessed the abuse but never defended Sherry.  Notably, Mr. Chapman was murdered during a drug deal in the 2010's. As the oldest male child in the home, and with all of the older adult males either dead or addicted to drugs and engaged in crime, Terrence acted as a father-figure to his younger siblings, a heavy emotional burden for a young boy to bear.

### *Adolescence and Terrence's Introduction to Basketball*

Unsurprisingly, Terrence's chaotic home life caused him problems in school.  He was bullied by his peers and had difficulty controlling his anger. As a result, Terrence acted out and got into frequent altercations with bullies. He was kicked out of several schools. In the seventh grade, Terrence began playing basketball, which served as an outlet for the anger and emotional pain that he was suppressing inside. He proved to be talented at the sport and continued to play with the hope of playing in high school.

Around this time, Terrence went to live with his friend, Marcus Williams, and Marcus' mother, Gail Williams. Marcus' life differed dramatically from Terrence's. Ms. Williams worked as an accountant for the University of Washington and the family had a clean home with multiple bedrooms. Life at Marcus' home was calm and pleasant. Terrence's mother did not want him to stay at first, but she ultimately decided that it would be best for him. He missed his family and felt guilty for having a better living situation than his siblings and not being home to protect and support them. Nonetheless, the structured environment allowed him to focus on basketball and work towards achieving his goals.

Terrence lived with the Williams family for four years. He attended Garfield High School in Seattle for his freshman year where he joined the basketball team. In his second year of high school, Terrence transferred to Rainier Beach High School, also in Seattle, where he attended from 2002 to 2005.  Terrence left the Williams home and moved into the home of Daniel Jurdy, his high school's athletic director who was known for offering his home to students with difficult home lives. Mr. Jurdy's girlfriend and his adoptive daughter also lived there. Terrence remains close with the Jurdys today, as evidenced by Mr. Jurdy's letter to the Court. *See* Exhibit A. Although he missed his mother and siblings and visited them often, living with Mr. Jurdy shielded Terrence from the negative influences and distractions that he would have otherwise faced at home. He continued to excel at basketball, and grew close to his basketball coach, Robert Delgardo, and his wife, Tracey, both of whom have written letters to the Court. *See* Exhibit A. He continued to play throughout high school, and graduated in 2005 with plans to play for the University of Louisville.

While in high school, Terrence became a father to two children. Jaraye (now age 20) was born in 2003 from Terrence's relationship with Jazmyne Jackson. That same year, his son Zamarion (now age 20) was born from a brief relationship with Zenobia Holmes. Having two children in a short period of time forced Terrence to think seriously about his future, and his dream to play professional basketball became more of a necessity. Given his own unstable upbringing and the lack of resources from his own family, Terrence wanted better for his sons and wanted to be able to support them. Terrence spent as much time as he could with his children during high school, and supported them financially to the best of his ability.

***College Basketball***

Terrence began playing college basketball for the University of Louisville in 2005.

During the 2008/2009 basketball season he sustained an injury to his left knee and underwent arthroscopic partial medial meniscectomy surgery. He attended physical therapy and was prescribed Vicodin for pain – the first time that he ever took a prescription painkiller. Terrence continued to play basketball for all four years of college. He majored in communication with a minor in creative writing and earned 90 college credits; however, he was drafted by the NBA before earning enough credits to complete his Bachelor's Degree.

Also in 2008, Terrence had his third child, Angelo, from a brief relationship with Tia Wilson.  Terrence spent as much time with his son as he could when on breaks from basketball and school and provided him financial support.  Having a third child strengthened Terrence's motivation to become a professional basketball player so that he would be capable of financially supporting his family.

***Professional Basketball Career***

In 2009, Terrence's dreams came to fruition when he was picked eleventh overall by the New Jersey Nets in the NBA draft.  He played for the Nets from 2009 until 2010, earning a two-year contract for $4.27 million. In 2010, he was traded to the Houston Rockets where he continued to play until the middle of the 2012 season.  During his time with the Rockets, Terrence was injured and underwent meniscus surgery on his right knee. He was prescribed Percocet for two months following the surgery.

From March 2012 to the end of the 2012 season, Terrence played for the Sacramento Kings. During that time Terrence again sustained a knee injury and underwent meniscus surgery on his right knee. He was again prescribed Percocet for two months following the surgery. But this time, Terrence continued to use the drugs beyond its prescribed duration. Terrence quickly found the Percocet relieved his stress and anxiety and numbed the negative feelings that he

carried with him throughout his life. While the usage started recreationally, Terrence soon became addicted. As he explained to Probation, it got to the point where he no longer felt high from the drug and had to take it so he would not experience withdrawal symptoms. Terrence took Percocet daily, obtaining the drugs through team doctors or purchasing it from illegal sources.

Terrence could not function without taking Percocet, but he did his best to mask his addiction and continued playing basketball.  He played with the Detroit Pistons during the 2012 summer training camp, and from November 2012 to 2013 he played in China for the Guandong Southern Tigers.  He then returned to the NBA in February 2013 and played for the Boston Celtics until June 2013.

Ultimately, Terrence's addiction, in combination with his injuries, impaired his ability to play basketball. After the 2013 season he left the NBA and began playing for international teams. From 2013 to 2015 he played in Turkey, Puerto Rico, Philippines, Dominican Republic, Mexico, Israel and Venezuela. He explained to probation that he was often brought in during the playoffs to assist the teams, and earned approximately $4,000 - $5,000 per week. Terrence stated that he does not remember much of his later basketball career due to his Percocet use, and noted that he left Turkey and the Philippines because he ran out of the drug, without which he could not play. Consequently, Terrence stopped playing professional basketball in 2015.

*Life after Basketball*

After his basketball career ended, Terrence lived primarily in Seattle, Washington until he was remanded in this case. His Percocet addiction consumed him; he acted recklessly and engaged in unstable relationships with women. By 2015, Terrence had four children who were dependent on him, two twelve-year olds, an eight-year-old, and an infant, Tristan, who was born in 2015.  At this time any money that he had went towards financially supporting his children as

well as his addiction.

In 2018, Terrence entered inpatient substance abuse treatment for opioid dependency at Schick Shadel Hospital in Burien, Washington, as verified by records obtained by probation. (PSR ¶ 219). Records note that he exhibited symptoms of anxiety and depression and was diagnosed with severe Opioid use disorder. *Id*. Terrence felt the treatment methods were too intense and he left after a few days. He resumed abusing Percocet until March 2019 when he decided to ween himself off of the drugs over a three-week period. Thereafter, although he stopped using Percocet, Terrence continued to smoke marijuana daily up until his arrest in this case to relieve physical pain from his knee injuries and to cope with stress and anxiety. Notably, Mr. Williams never received mental health treatment for the many traumas he endured during childhood, and appears to have used drugs as a form of self-medication.

In 2018, Terrence welcomed his fifth child, a daughter, Leah, who was born from his relationship with Flora Santa Cruz. Terrence and Flora eventually separated but agreed to share custody of Leah. However, Flora moved to Florida and their daughter stayed with Terrence in Seattle, making him her primary caretaker and primary financial supporter.  Paris Ramsey writes in her letter to the Court:

> When Terrence had his daughter, it drastically changed his life. It was one thing to have boys to look after but adding a girl into the mix brought out a softer side. He was hands on from day one – moving her to Seattle so he could care and provide for her – even being a single dad which something often most do not see occur. He built an incredible bond with his daughter and his absence is greatly felt by her. She slept next to him every night, often ending up right underneath his arm, laying on his chest, he wouldn't have it any other way.

Exhibit A.

In approximately 2019, Terrence encountered another setback when his mother, Sherry, was diagnosed with cancer. She underwent chemotherapy for one year and went into remission.

11

The cancer reappeared a year later and she underwent chemotherapy again. Terrence and his sister were his mother's primary caretakers throughout her illness and treatment, which took an emotional toll on Terrence. Sadly, she passed away on June 26, 2020, causing Terrence additional grief and anxiety which he was unable to cope with.

In 2021, Terrence began dating his partner, Paris Ramsey, age 34. Terrence and Paris had been friends for many years before beginning a romantic relationship. In 2021, they welcomed a son, Ezekiel, who is now two years old. Terrence resided with his infant son, daughter, and two older sons at the time of his arrest and prior to his remand in this case.

### Circumstances of the Offense

While the Court is already generally familiar with the facts of this case, as set forth in the Presentence Report, and from having sentenced several of Mr. Williams's co-defendants, there are circumstances unique to his offense conduct that should be evaluated in fashioning an appropriate punishment. These circumstances are not presented as protestations of Mr. Williams's innocence or as an attempt to excuse his criminal behavior or shift blame to others. Rather, they are mentioned as mitigating factors, relevant to his conduct and his overall character, which should be considered in formulating a reasonable sentence.

Mr. Williams's offense conduct spanned from 2017 to the time of his arrest in 2021. When Mr. Williams first became engaged in the conspiracy, he was suffering from anxiety and depression which contributed to his serious abuse of the prescription drug Percocet. Mr. Williams became addicted after being prescribed the drug following knee surgery in 2012. The painkiller numbed his otherwise untreated mental health problems that had manifested from his traumatic childhood – his parents' incarceration, his father's murder, the poverty and drug abuse prevalent within his immediate family, and the sexual abuse that he suffered at the hands of a caregiver.

Mr. Williams took Percocet to feel high and eventually could not survive without the drug. The majority of his finances went to support his addiction, and ultimately impaired his basketball career, causing him to lose his only source of income when he stopped playing professionally in 2015.

Given Mr. Williams's unstable upbringing, it is remarkable that he did not follow into the footsteps of his father, grandfather and uncles and turn to a life of crime and violence, as the only male role models in his life did.  Basketball saved Mr. Williams's life and allowed him to forge his own path to success, but he had to rely on himself to do it. Although the Delgardos and Jurdys offered positive influences that helped Terrence along the way, they could not replace the emotional support, guidance and stability that he needed from his own family members. This void left Terrence with an inadequate foundation for figuring out what to do with his life once his basketball career ended. That career had been his only form of employment which he maintained since the age of twenty-two.  Driven by the need to financially support his children, and financially support his drug addiction, Mr. Williams sought an easy way out and made the poor decision to engage in the instant criminal scheme for his own financial gain.

Mr. Williams accepted responsibility for his offense conduct by pleading guilty to Counts One and Two of the instant indictment.  He is cognizant of the seriousness of his actions and is remorseful to those impacted by his crimes, to his family, and to the Court.  He is also grateful for the "wake up call" this case has served him, as it forced him to face his poor choices and reevaluate his life.

This case represents Mr. Williams's most serious offense conduct, his first federal offense, and the longest time he has ever spent in jail.[1]  The last year that Mr. Williams has been

---

[1] Mr. Williams's only prior criminal conviction is for reckless driving for which he served four days in jail.

incarcerated, separated from his family, especially his youngest son who was only eight months old when Terrence was remanded, has been a harsh reality for him to face. He intends to never do anything again that could place him in this same situation.  Mr. Williams has expressed the desire to receive additional substance abuse treatment, and he is hopeful that with the appropriate treatment he can build the foundation for leading a positive, law-abiding life going forward.

### Harsh Conditions of Incarceration at the MDC

By the time of sentencing, Mr. Williams will have served over 14 months in custody at the Brooklyn Metropolitan Detention Center ("MDC"), a jail which has been criticized in the media and by the courts for its poor treatment of inmates.  Mr. Williams was remanded to the MDC on May 6, 2022 following a violation of his bail conditions.  Although Covid-19-related restrictions had decreased by the time that Mr. Williams arrived at MDC, the deplorable conditions at the facility remain. On August 16, 2022, local officials in Brooklyn submitted a letter to Attorney General Merrick Garland and BOP Director Colette Peters detailing the MDC's longstanding "systemic dysfunction" that "has resulted in years of unacceptable conditions of confinement for detainees, denial of basic necessities, and inadequate access to counsel and legal materials," calling the situation a "humanitarian crisis [that] must be addressed now."[2]

Despite the decrease in Covid risks, MDC continues to place inmates on lockdown multiple times a month, if not weekly, for days or weeks at a time. The lockdowns appear to be the result of many factors, including staffing shortages, violence and criminal activity within the jail, although most of the time inmates are not informed of the reason. In sum, since arriving at the MDC over one year ago, Mr. Williams has been living on lockdown for days or weeks at a time, through no fault of his own, making his time in custody more punishing than under

---

[2] *See* https://www.brooklynpaper.com/wp-content/uploads/2022/08/FINAL-letter-re-MDC-Brooklyn-8.16.pdf

ordinary circumstances. Additionally, because Mr. Williams's family resides in Seattle, Washington, he has had no in person visits with his wife, children or other family members since he was remanded, which has added to the harshness of his incarceration.

Finally, Mr. Williams sustained a debilitating injury while in BOP custody which worsened due to the jail's failure to provide necessary treatment.  As the Court is aware from our previous bail applications, Mr. Williams tore his Achilles tendon while playing basketball on June 5, 2022.  (PSR ¶ 211); *see also* Exhibit B[3] (excerpts of Mr. Williams's medical records[4]). He was brought to Brooklyn Hospital and was advised by doctors that he needed to stay overnight for immediate surgery. But the United States Marshals declined to leave him overnight and he was returned to MDC without the necessary surgery. Mr. Williams was in excruciating pain and provided only with aspirin which did not relieve the pain.  He was also provided crutches and an ill-fitting walking boot, which quickly broke, and was never given a replacement. No provisions were made for him to elevate his foot, nor was he given ice or other treatment that was recommended by the hospital.

Mr. Williams did not receive surgery until July 28, 2022, seven weeks after the recommended date.  He was informed by doctors that the lapse of time between the injury and the surgery had exacerbated his condition and resulted in irreparable damage to the cartilage in his foot. Those who escorted him to the hospital were informed that Mr. Williams needed to be brought back for a follow-up in two weeks.  But it was not until September 9, 2022, nearly six weeks after he was supposed to receive a follow-up that he was returned to the hospital to have his stitches and cast removed. *See* Exhibit B. He was also prescribed a particular type of physical

---

[3] It is respectfully requested that the medical records be filed under seal because they include sensitive medical information and identifying information.
[4] In the interest of efficiency, only relevant excerpts of Mr. Williams's medical records have been included with Exhibit B. Counsel will provide the complete BOP medical record if desired by the Court.

therapy that the MDC could not provide. *Id.* After weeks of communications by counsel to the government and the BOP, Terrence was placed at Kingsbrook Jewish Medical Center in Brooklyn, New York. The location could not be disclosed to counsel per BOP rules and counsel was unable to speak with Mr. Williams to assess the progress of his treatment. Terrence ultimately opted to leave the facility after two weeks due to the difficult living conditions, which required him to be chained to a bed for the day except for when participating in physical therapy, and restricted his access to his attorney and phone calls with his family members. Mr. Williams also sustained an additional wound to his already injured ankle from the shackles being locked too tightly to his ankle.

Despite these harsh conditions, Mr. Williams's has incurred no disciplinary infractions while at the MDC.

Accordingly, the BOP's delayed and inadequate treatment of Mr. Williams's injury in combination with the continuous lockdowns at the MDC has made his time in custody more punishing than under ordinary circumstances. It is respectfully submitted that the Court consider these unduly harsh conditions of incarceration in determining the appropriate sentence.

**The Need to Avoid Unwarranted Sentencing Disparities**

Finally, in imposing sentence the Court must consider the need to avoid unwarranted sentencing disparities. While the Court has to consider the unique facts and circumstances relevant to each individual, in viewing the sentences imposed upon Mr. Williams's co-defendants, in addition to consideration of other relevant sentencing factors set forth in this letter, the requested sentence of 50 months would be consistent with previously sentenced co-defendants with similar culpability.

Of all the defendants sentenced by your Honor, the most analogous to Mr. Williams in

16

terms of role and culpability is Keyon Dooling. Mr. Dooling pleaded guilty to the lesser included offense of Count One, Conspiracy to Commit Health Care Fraud. He received a sentence of 30 months. Mr. Dooling's Guidelines were 33 – 41months' based on a Criminal History Category of I and a Total Offense level of 20, which included in its calculation the addition of 14 levels for loss amount and three levels for being a manager or supervisor of extensive criminal activity. *See* ECF Dkt. 819 at 4. Mr. Dooling's intended loss amount was $558,659, which the government notes in its sentencing submission is a "conservative" attempted loss calculation "given the sheer number of individuals that Dooling attempted to recruit into the scheme." *See* ECF Dkt. 787 at 5. The government called Mr. Dooling a "leader" who played an "essential role" in the offense. *Id*. at 2. Specifically, Mr. Dooling introduced players to Dr. Khaziran, had Khaziran charge players' debit cards for which he received kickbacks, attempted to recruit players and sought out medical providers, which was supported by extensive text messages showing him trying to recruit people. *Id*. at 2 – 5. He submitted 32 invoices from Dr. Wahab's office and 292 invoices from Dr. Khaziran's office, seeking a total of $364,000 in reimbursements. *Id*. The government stated that although Dooling's intended loss amount of over $500,000 is significantly lower than that attributable to Williams, "there should be no mistake that Dooling was a leader of this criminal scheme" and is in the "upper tier of culpability." *Id*. at 7.

Indeed Mr. Williams's Guidelines are significantly higher than Mr. Dooling's, which is in large part because the Guidelines are substantially driven by the loss amount attributable to him and his acceptance of responsibility for obstruction of justice. Based on all of these facts, it is respectfully submitted that a sentence of 50 months' imprisonment adequately reflects Mr. Williams's culpability and role in the scheme when compared to that of his co-defendants.

**<u>Conclusion</u>**

For all of the foregoing reasons, and in light of the factors to be discussed at the time of sentencing, it is respectfully submitted that Mr. Williams be sentenced to 50 months' imprisonment, followed by a reasonable period of supervised release, and a mandatory special assessment of $200.

Dated:   New York, New York
         July 10, 2023

                                        _____/s/_____
                                        David Stern
                                        Rothman, Schneider,
                                              Soloway & Stern, LLP
                                        *Attorney for Terrence Williams*
                                        100 Lafayette Street, Ste 501
                                        New York, New York 10013
                                        (212) 571-5500

To:   CLERK OF THE COURT
      United States District Court
      Southern District of New York
      500 Pearl Street
      New York, New York 10007

      THE HONORABLE VALERIE E. CAPRONI
      United States District Judge
      Southern District of New York
      40 Foley Square
      New York, New York 10007

      RYAN B. FINKEL
      DANIEL NESSIM
      Assistant United States Attorneys
      Southern District of New York
      One St. Andrew's Plaza
      New York, New York 10007