

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 11, 2023

**BY ECF**
The Honorable Valerie E. Caproni
United States District Court Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    **Re:**   ***United States v. Terrence Williams*, S3 21 Cr. 603 (VEC)**

Dear Judge Caproni:

    Terrence Williams orchestrated, directed, and profited from a sprawling, yearslong conspiracy that targeted the NBA Players' Health and Welfare Benefit Plan (the "Plan"). Williams's role in this vast criminal scheme was unlike any of his co-defendants. Williams was the conspiracy's leader. In that role, he turbocharged the conspiracy. Indeed, Williams recruited— or caused others to recruit—nearly all the former NBA-player defendants charged in this case. Williams also recruited individuals, and medical providers, to make fraudulent medical documents upon which the scheme relied. To accomplish this breathtaking fraud, Williams forged signatures and even impersonated employees of the Plan's administrative managers. Williams actions sought to rob the Plan of more than $5 million, and he and his co-conspirators successfully stole approximately $2.5 million from the Plan. The consequences of Williams's conduct impacted the Plan and could have threatened its tax-exempt status. Not only did Williams lead the fraud, but Williams also deployed deceptive tactics against some of his co-conspirators—and stole from them. Then, after his arrest, while under the supervision of this Court, Williams's criminal conduct continued when he threatened a witness.

    Given Williams's role in this wide-ranging conspiracy, a sentence within the Stipulated Guidelines Range of 121 to 145 months' imprisonment, is appropriate in this case.

**I.**    **Background**

    **A. Overview of the Scheme**

    Among other benefits, the Plan provides current and retired NBA players, who satisfy certain eligibility criteria, with reimbursements for qualifying medical expenses. Players are eligible to draw on a particular amount of funds, which is based on the number of seasons in which the individual played in the NBA. NBA teams fund the Plan on a regular basis. Funds available also increase and decrease based on a pro rata distribution of the Plan's investment gains or losses. In addition to players eligible to participate, certain spouses, children, and other dependents ("Participants") may also submit claims to the Plan.

Hon. Valerie E. Caproni
Page 2 of 14

Participants can submit claims to a third-party administrative manager.  Participants can also use a Plan-issued debit card that is directly funded by the Plan.  Where funds are dispersed and claims are approved, Participant medical expenses are paid for directly or expenses are reimbursed.

Terrence Williams involvement in the conspiracy began in late 2017.  Around this time, he received financial assistance from an NBA Players' Association program, which co-defendant Keyon Dooling helped to arrange.  Thereafter, Williams's involvement in the scheme began.  Around this time, Williams emailed invoices for Advanced Chiropractic and Rehab Center ("ACRC") to CC-1.  CC-1 responded to Williams with new ACRC invoices, with modified dates, which were then submitted in support of Williams's $19,000 fraudulent reimbursement claim for ACRC services.  At this time, Williams knew that co-defendant Patrick Khaziran, a chiropractor, was involved in the scheme working with, among other former-players, Dooling.  Dooling recruited several players into the scheme, and the Government assess that Dooling initially brought Williams to the fraud.  But after submitting his own fraudulent ACRC invoices to the Plan, Williams exponentially expanded it in terms of the number of individuals (who were located across the country) and the amounts they sought to be paid.

## B. Williams Directed CC-1 to Create False ACRC Invoices

In or about 2018, Williams recognized that his notional account was exhausted, thus to continue to collect fraudulent proceeds the scheme needed additional players.  Williams began contacting many former players and sought to recruit them into the scheme.  Around the same time, Williams asked CC-1 to create additional ACRC invoices for other former NBA players.  CC-1's involvement bypassed Khaziran who, at that time, had stopped making fraudulent invoices for Williams.

Williams engineered, developed, and implemented the conspiracy's tactics, which generally proceeded as follows:  First, Williams contacted former players, and recruited them into the conspiracy.   Second, Williams directed former-player co-conspirators to contact the Plan's third-party administrator ("TPA"),[1] and learn from the TPA the total value of each former-player's notional account.  If necessary, the former players registered with the TPA and obtained a Plan-issued debit card, which was to be used for legitimate medical expenses.  Third, Williams instructed CC-1 (or others) to create medical invoices (or other documentation).  Often Williams selected the total value of those fraudulent invoices for each player—an amount he calculated based on the amount available in the former player's notional Plan account.  Fourth, CC-1 emailed Williams the fraudulent invoices.  Williams then provided those invoices to the former players who submitted them to the TPA.  Fifth, typically, after the co-conspirator was paid by the TPA, they provided Williams a kickback.  However, sometimes Williams was paid upfront.

Williams directed CC-1 to create dozens and dozens of fraudulent invoices in the names of several former NBA players.  Williams—who was emotionally abusive to CC-1, nearly always

---

[1] On some occasions Williams contacted the TPA on the former-player's behalf.

Hon. Valerie E. Caproni
Page 3 of 14

carried a gun, and on at least one occasion pushed CC-1—promised CC-1 $2,000 for her work in the scheme.  But Williams never paid CC-1.

### C.  Williams Directed Aamir Wahab to Create False Invoices

Concurrently with ACRC invoices created by CC-1, Williams obtained invoices from Aamir Wahab.  Wahab, a dentist in Los Angeles, produced invoices and sent them to Williams via email.  On some occasions, Williams interfaced with co-defendant Sophia Chavez, an office worker in Wahab's dental office, who also produced fraudulent invoices for Williams and his co-conspirators.  Messages recovered from Wahab's cellphone evidence the nature of Williams and Wahab's relationship:

| From | To | Message |
|------|-----|---------|
| Aamir Wahab | Terrance Williams | What dates can I put on these invoices[?] |
| Terrance Williams | Aamir Wahab | You can do this year for them Like [20]18 [and] [20]19 of d[arrius] miles came to you Then do his like a year later for them |
| Terrance Williams | Aamir Wahab | You want total [invoice amount] now[?] |
| Aamir Wahab | Terrance Williams | Send me the totals for each |

Williams and Wahab's text messages were explicit about the scheme.  In March 2019, Williams wanted Wahab to charge co-conspirators' Plan-issued debit cards more frequently, but Wahab was initially reluctant.  While disagreeing about whether to charge the debit cards, Williams and Wahab also argued about whether Williams owed Wahab approximately $12,000 in fraud proceeds.  Annoyed and angry, Williams messaged Wahab:  "YOUVE MADE THOUSANDS OF F[----]ING DOLLARS TO PRINT A[N] INVOICE WITH A NAME AT THE TOP like you f[----]ing kidding me[?!]  We not gonna act like you doing dental work."

In September 2019, the Plan was internally investigating potential fraud by Plan participants.  In connection with that investigation, the Plan sent materials to Plan participants, including co-conspirators of Williams, seeking documentation and HIPAA consent forms so that the Plan could obtain materials from medical providers.  When co-defendant Charles "C.J." Watson received those materials, Williams consulted Wahab via text message:  "They sent cj [Watson] a hippa [sic] form."  Wahab recognized the potential threat to their scheme and advised that if the HIPAA form was authorized, the Plan "can technically ask for the chart xrays and everything."  Two days later, Williams advised Wahab that he "just got [his HIPAA] letter in the mail [from the Plan seeking information about submissions]. . . .  [Darius] Miles to[o]."  Wahab advised "[t]hat means they're sending it to everyone, and suggested Williams not sign the HIPAA form.  Williams answered "[w]ell i wasn[']t signing it anyway," to which Wahab responded "Lol yea cuz I'm not giving em info."

Hon. Valerie E. Caproni
Page 4 of 14

### D. Williams Directed CC-2 to Create False ACRC Invoices and Williams Created Fraudulent Letters of Medical Necessity

Eventually, CC-1 stopped creating fraudulent ACRC invoices for Williams. Williams then recruited an acquaintance ("CC-2") to create fraudulent ACRC invoices for co-defendants Ronald Glen Davis, Antione Wright, and Charles "C.J." Watson. Williams never paid CC-2 for creating these invoices. On or about May 8, 2019, Davis, Wright, and Watson submitted claims for services purportedly provided by ACRC. These services were never provided, and the invoices supporting the claims were fraudulently created, at Williams's direction, by CC-2. As the invoices were very similar to each other, the Plan's administrative manager ("TPA-1") requested that Wright, Davis, and Watson provide a letter of medical necessity to establish that the purported services were medically necessary. Williams sent Wright, Davis, and Watson forged letters of medical necessity, which purported to be signed by Khaziran. The letters contain obvious grammatical errors. A copy of a letter appears below:

5.31.19

Hello, I was told a letter was needed for some players, for

Reimbursement. I am the main physician at ADVANCED CHIROPRACTIC & REHAB CENTER

And Antonie Wright, has been coming here for treatment. Full body service that was required to get

Him healthy, Chronic pain in knee and neck.

Thank you, DR. Pat,

Wright, Davis, and Watson submitted the forged letters of medical necessity to TPA-1. But the letters were not sufficient to release reimbursement payments. Instead, questioning the authenticity of the letters, the Plan's administrative manager informed the participants that the letters of medical necessity must be from a primary care physician on official letterhead.

When the forged letters did not work, Williams continued to work with co-defendant Alan Anderson[2] to get the Plan to authorize the reimbursement payments for Wright, Davis, and Watson. Anderson helped arrange for Wright, Davis, and Watson to visit a doctor based in Las Vegas ("Doctor-1"). Wright, Davis, and Watson saw Doctor-1 on the same day, and Anderson was there too. Anderson represented, in substance, that seeing Doctor-1 would provide the necessary support for the Plan to release the requested reimbursements.

---

[2] Anderson helped recruit Wright and Watson into the conspiracy.

On June 12, 2019, Anderson emailed Williams three letters, signed by Doctor-1 purporting to refer Wright, Davis, and Watson to ACRC. These June 12 letters included one sentence concerning the basis for the referral. On or about June 25, 2019, Anderson emailed Williams updated Doctor-1 referral letters for the three, which included more detail. These June 25, 2019, letters were submitted to the Plan in further support of Wright's, Davis's, and Watson's claims. But they did not work, and TPA-1 declined to reimburse Wright, Davis, and Watson for these claims. In total, Wright, Davis, and Watson sought approximately $710,000.

### E. Williams Directed William Washington to Fraudulently Charge Plan-Issued Debit Cards and Create False Invoices

In or about the summer of 2019, Williams recruited Dr. William Washington into the conspiracy. Like Khaziran, CC-1, CC-2, and Wahab before him, Washington's role was to provide fraudulent documents for the scheme. Washington also charged co-defendants' Melvin Ely and Milt Palacio's Plan-issued debit cards. Williams instructed Washington to charge Ely and Palacio's Plan-issued debit cards daily. Williams appeared to believe that many relatively small charges would invite less scrutiny than a single submission for a substantial amount. On April 13, 2020, Williams explained as much to co-defendant Darius Miles in a voice memo that Williams sent to Miles via WhatsApp:

> I got this doctor up here [William Washington] and right now he's been doing [Melvin] Ely and Milt [Palacio] . . . he's just been swiping every day and they be splitting the swipes or whatever . . . . I've been sending them [Ely and Palacio] the cash . . . . So, we don't do nothing through the bank and sh[-]t . . . . Not submitting no big invoices and just been doing it like they came in for treatment and the treatment cost—let's say the treatment cost 30 grand—we're not submitting no big invoices that said they [Ely and Palacio], paid for it in cash. We're just saying that they owe the clinic $30,000. So, they've been swiping. So, like, this doctor has been in touch with, with, with, [TPA-1], or whatever, the whole time. [TPA-1 will] call him and ask, 'well what about these charges?' [Washington will] be like, well, it's for this treatment. They came in on this time or whatever. We'll buy a flight, so it looks like they came in. And they'll [TPA-1] be like 'alright.' . . . One swipe a day since August and that's every day. Monday through Sunday. So, I can have your[ ] [Plan-issued debit card] being swiped, whatever is left, yours being swiped daily or whatever from another doctor that's [Washington's] friend or whatever . . . . Or whoever else you got or whatever. And put them in different places. You see what I'm saying? Because where I f[---]ed up is we were all going to the same place, doing the same people that already been doing the sh[-]t for years. Even before me. So, we put them with different doctors. One

Hon. Valerie E. Caproni
Page 6 of 14

       or two here, one here, or whatever, and you swipe them daily . . . .
       That sh[-]t is going to work. Slowly but surely.[3]

      Consistent with the above, and at Williams's direction, Washington did exactly that. Washington charged (or caused others at his office to charge) Ely and Palacio's Plan-issued debit cards nearly every day for months.  Ely and Palacio never received services from Washington.  Then to further (falsely) corroborate that Washington provided Ely and Palacio services, Washington created fraudulent invoices, emailed them to Williams, who, in turn, passed them to Palacio and Ely for submission to the Plan.

### F.  Williams Used Threats and Other Tactics to Obtain Money from Co-Conspirators

      Williams earned money from the scheme (i) by obtaining a kickback from co-conspirators after they were paid by the Plan; (ii) from co-conspirators who paid Williams before receiving a Plan payment; or (iii) from medical providers (*e.g.,* Wahab and Washington) who created fraudulent invoices and swiped Plan-issued debit cards.  The percentage of fraudulent proceeds that Williams received varied.  Some former players agreed to pay Williams 50% of the proceeds they obtained while some kickback arrangements were considerably less.[4]  To ensure he received his kickback, sometimes Williams repeatedly contacted co-conspirators.  In several cases, Williams employed threats and other methods to obtain payments from those who "owed" him.

#### 1.  Williams Created an Email Account to Impersonate a TPA Employee

      On various dates in June 2018 and February 2019, Williams impersonated an employee of TPA-2.   Specifically,  Williams  set  up  an  email  account  with  the  username [Name-1][TPA-2]benefits@gmail.com.[5]  Name-1 was the first name of an employee of TPA-2, and that employee was primarily responsible for handling the Plan's NBA account.  In June 2018, [Name-1][TPA-2]benefits@gmail.com sent an email to the spouse of a co-defendant, which stated "my part[n]er [Name-2] has received a call and email, regarding wrongful payments sent out to your account. We will speak back to the source tomorrow to confirm everything and will get back to you.  Just for the record, if it was wrongful payments, only thing would happen is you send us both payments back in full, the following business day. Thank you speak soon."

      In February 2019, [Name-1][TPA-2]benefits@gmail.com sent an email to co-defendant Christopher Douglas-Roberts, which read, in part, "We recently received information that your

---

   [3] Williams's explanation of the process with Washington appears designed to avoid the issues that led to the Plan dispatching letters to Watson, Miles, and Williams, as Williams described to Wahab via text in September 2019.  *See supra* p. 3 - 4.

   [4] In a message Wahab sent to another co-conspirator in 2018, Wahab explained "[w]hen we did it with [K]eyon [Dooling] I got 20% since there was more people involved.  When I did it on my own with Terrance last year we just split."

   [5] Conduct regarding the [Name-1][TPA-2]benefits@gmail.com account is the basis for the aggravated identity theft charge in Count Two.

Hon. Valerie E. Caproni
Page 7 of 14

newest reimbursed claim has the same processed invoice numbers as another claim for a different player. Per policy both claims are in the process of being voided. If this is incorrect, please reach out to your provider at Advanced Chiropractic & Rehab Center and have them call me as soon as possible to cancel the voids of invoices. If the void to these invoices is correct we will need to receive your funds back within 48 business hours before a[n] investigation is opened on the matter." CC-1 assisted Williams in drafting this email, but it was Williams who insisted on including "get back within 48 business hours before an investigation is opened on the matter."[6]

2. <u>Williams Threatened a Co-Conspirator</u>

In or about January 2019, Williams told co-defendant Gregory Smith that he contacted Smith's local bank to ensure they could process a check from the Plan, which represented fraudulent proceeds. Williams then continued to message Smith asking for his kickback and, believing that Smith was intentionally avoiding making that payment, stated: "I don[']t think you [are] playing with me[, I] feel like you wouldn't have gave me your add[ress] and your grandma[']s [address] if you was gonna play a game." Smith viewed the reference to his home address, and that of his grandmother's, as a threat. After the check from the TPA cleared, Smith provided Williams approximately $77,000 (50% of the fraudulent proceeds) via a wire transfer to a bank account held in the name of an associate of Williams.

In July 2019, Williams sent a text to Smith claiming to be "Terrence['s] Lawyer . . . . You took over 170k from [TPA-1] sir, on paperwork a doctor gave from you[,] you don't want to talk to me that's fine[.] But at some point you will have to speak to someone. Right now it can be fixed." This message appears to have been another attempt by Williams to obtain additional money from Smith. That is, pretend to be an attorney investigating the fraud. If Smith agreed to make a payment, it would "be fixed."

3. <u>Williams Impersonated Individuals to Obtain Money from Washington.</u>

In October 2020, Williams created another email account. The username of this account was [Name-3].[TPA-2]@gmail.com. Name-3 was the first name of two employees of TPA-1 who managed the NBA Plan account.[7] This email account was used to obtain money from Washington, by convincing Washington that the Plan had frozen Ely and Palacio's accounts until the "balance" was repaid. In an email from that account to Washington, Williams (or a co-conspirator) wrote:

---

[6] Within the [Name-1][TPA-2]benefits@gmail.com account was a receipt for a music entertainment website, which was paid for with Williams's credit card. Further evidencing that Williams controlled this email account, the [Name-1][TPA-2]benefits@gmail.com account received emails from CC-2 pertaining to the scheme.

[7] Williams appears to have confused TPA-1 and TPA-2 when creating this email account's username.

Hon. Valerie E. Caproni
Page 8 of 14

> Per our conversation today here's where we are.
>
> Milton  Palacio has a balance of $34,863
>
> Melvin Ely has a balance of $11,824
>
> Balances are due in full today, October 16, 2020. Once accounts are in good standing, their card will be activated.
>
> Melvin Ely will have a balance of $223,660 available to use per his HRA account
>
> Milton Palacio will have a balance of $310,420 available to use per his HRA account.
>
> I have also sent copies to the players as well.

That email was signed "Name-3" and "TPA-1."

From October 2020 through March 4, 2021, the individual purporting to be "Name-3" corresponded with Washington about invoices submitted to TPA-1 on behalf of Ely and Palacio. After several emails, the nature of the emails changed and "Name-3," along with other false personas, including a purported lawyer, requested that Washington pay a "fine" to prevent TPA-1 from reporting Washington to the authorities.  While the Name-3 email account was messaging Washington, text messages indicate Williams was encouraging Washington to do what "TPA-1" asked of him.  Indeed, Williams, or perhaps a co-conspirator under his direction, also created false letters bearing TPA-1 letterhead.  Those letters were sent to Washington which purported to show that Ely and Palacio's accounts were frozen unless the players "repay and assessed the 20% tax penalty."  Some of the emails from "[Name-3]" copied Williams's email account.  In the end, Washington paid Williams approximately $620,000—$274,000 of which were "repayments" of the money Washington worked with Williams to steal.

## G.  Williams's Arrest and Post-Arrest Obstruction

On October 7, 2021, Williams was arrested in the Seattle home he shared with his then-girlfriend and their infant child.  Another child who was approximately four or five years old was also present in the home that day.  Concurrently with his arrest, the FBI executed a search warrant on Williams's residence.  The FBI recovered several electronic devices including Williams's cellphone.  The FBI also identified several firearms in the home (as pictured below).  In Williams's bedroom, next to the bed, was a semi-automatic handgun.  On the other side of the bed was an assault rifle and a loaded magazine.  In a separate room, where Williams was located, the FBI found a Glock 9mm on a desk.  The FBI also discovered a revolver in another room of the home.

Hon. Valerie E. Caproni
Page 9 of 14





Hon. Valerie E. Caproni
Page 10 of 14



    Additional ammunition was found in a safe.

    Following his arrest, Williams was released subject to conditions including not to contact co-defendants and known witnesses outside the presence of counsel.   (ECF No. 77.) Notwithstanding the clear condition not to contact witnesses, approximately two-weeks after his arrest, Williams's friend ("Friend-1") was in a bar with CC-1.  Friend-1 gave CC-1 their cellphone, and on the other end of the call was the defendant.  Williams said he was planning to plead guilty because it is "the feds" and there was not much that can be done.  In mid-December 2021, CC-1 was contacted by Friend-1 who explained that Williams wanted to "see" CC-1.  CC-1 asked why.  Later, after some back and forth, CC-1 asked Friend-1 whether Williams still wished to see Witness-1.  Friend-1 reported that Williams wanted to meet C-1 for a massage, which CC-1 declined.

    On April 26, 2022, Williams contacted CC-1 from an "anonymous" phone number ("Phone Number-1) via text message.[8]  In the messages, Williams warned CC-1 that she is "talking way to[o] f[---]ing much about my case. . . .  Telling people bout your laptop."  Williams continued "[b]ra shut the f[---] up this is my life[.]  You snitched so snitch in f[---]ing silence."  The defendant then claimed CC-1 lied and that CC-1 received money from him.  Witness-1 responded defensively

---

    [8] Phone Number-1 was registered to a particular mobile application, which enables its users to register phone numbers for text messages and voice calls.  Phone Number-1 has been registered to several different users, but on August 17, 2021, Phone Number-1 was registered to a particular private email address ("Email Address-1").  No other users were registered to Phone Number-1 from August 17, 2021, through the date that CC-1 received threating messages.  Accordingly, the user of Email Address-1 was the user of Phone Number-1 on April 26, 2022.  According to records obtained from the provider of Email Address-1, Email Address-1 is registered to an account subscribed in the name of "Terrence Williams."

Hon. Valerie E. Caproni
Page 11 of 14

and told Williams to "go to f[---]ing hell." After directing CC-1 to remain quiet, Williams then ominously threatened her stating, "we will run into on[e] another…be well the outcome not what you think." Williams continued that he "can't wait to spit in your face [r]ight at the bar . . . . Me spitting in your face is exactly what you'll see."

As a result of these threats, the Court remanded Williams on May 6, 2022.

### H. Williams's Guilty Plea

On August 26, 2022, pursuant to a plea agreement with the Government, Williams plead guilty to Counts One and Two of the above-captioned Superseding Indictment. Under the terms of the plea agreement, Williams agreed to restitution in the amount of $2.5 million, which represents the actual loss for which Williams is responsible. Williams stipulated that the intended loss exceeded $3,500,000—and as reported in the PSR the Government assesses that Williams attempted to defraud the Plan of approximately $5,000,000. (PSR ¶ 137.) Under the plea agreement, Williams agreed to forfeit $653,672.55.

Williams further stipulated that the applicable offense level is 30 and his criminal history category is I. Accordingly, the Guidelines range is 97 to 121 months imprisonment for Count One. Applying the mandatory consecutive sentence for Count Two,[9] the applicable Guidelines Range is 121 to 145 months (the "Stipulated Guidelines Range").[10]

### II.   Discussion

#### A.   Applicable Law

Following *United States v. Booker,* 543 U.S. 220 (2005) and *United States v. Crosby,* 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone. Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult" them and "take them into account" when sentencing. *Booker,* 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating

---

[9] The "aggravated identity theft statute provides that 'in determining any term of imprisonment to be imposed for the [underlying] felony' — here, Count One — the [Court] 'shall not in any way reduce the term to be imposed for such crime so as to compensate for, or otherwise take into account' the two-year mandatory consecutive sentence for the aggravated identity theft offense." *United States* v. *Mends*, 412 F. App'x 370, 375 (2d Cir. 2011) (quoting 18 U.S.C. § 1028A(b)(3)); *see also United States* v. *Omole*, 523 F.3d 691, 699 (7th Cir. 2007) (holding that had the sentencing judge "even slightly factored" Section 1028A's mandatory two-year sentence into his decision to lean toward a lighter sentence on the predicate felony counts, "he would have violated 18 U.S.C. § 1028A(b)(3)").

[10] The Probation Department determined that Williams is criminal history category II and thus the Guidelines Range is 132 to 159 months. The Government stands by the calculation in Plea Agreement.

Hon. Valerie E. Caproni
Page 12 of 14

the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7).  *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant;
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## B.  A Sentence Within the Stipulated Guidelines Range Is Sufficient and Not Greater Than Necessary

A significant sentence, one within the Stipulated Guidelines Range, is sufficient, but not greater than necessary, to comply with the purposes of sentencing.  Specifically, such a sentence is appropriate to reflect the nature and seriousness of the offense, to provide just punishment for the offense, promote respect for the law, and afford adequate deterrence to criminal conduct.  *See* 18 U.S.C. §§ 3553(a)(1), (2)(A)-(B).

The defendant's conduct at is extremely serious.  The defendant led a multiyear, multimillion dollar, multidefendant conspiracy.  Through the course of the nearly four-year fraud scheme, Williams impersonated several different people (some real and some imagined), created (or directed others to create) hundreds of pages of fraudulent invoices and medical receipts, created (or directed others to create) fraudulent letters of medical necessity as well as fraudulent documents purportedly from TPA-1.  Williams's conspiracy robbed the Plan of at least $2.5 million—and sought to steal nearly double that.  To accomplish this impressive fraud, Williams recruited, or had others recruit, dozens of individuals who were located across the country.  Not only did Williams recruit former-players, but he also found medical providers and lay-persons to construct fraudulent invoices and other phony documentation.  Williams even roped in at least one other individual so that he can hide fraud proceeds in that person's bank account.

Hon. Valerie E. Caproni
Page 13 of 14

The seriousness of Williams conduct is underscored by his relentless efforts to evolve the fraud and adapt its techniques. When Khaziran declined to continue to make ACRC invoices, Williams found CC-1. When CC-1 stopped, Williams recruited CC-2. Indeed, even after the Plan started investigating potential fraud—and Williams became aware of that investigation—Williams did not stop. He doubled down and changed tactics again. As Williams explained in a voice memo to Darrius Miles, Williams recruited Washington to swipe cards each day so that "slowly but surely" the fraud would continue. Williams was committed to continue to expand the criminal scheme's breadth by finding "different doctors. One or two here, one here, or whatever, and you swipe [Plan-issued debit cards] daily."

Williams's manipulation went far beyond creating and obtaining fraudulent invoices to submit to the Plan. He created forged letters of medical necessity, and helped arrange for co-defendants to see a doctor to obtain other letters of medical necessity. Williams also turned his tactics on his co-conspirators. He pretended to be employees of the TPAs to obtain money from them, and even disguised himself as a lawyer to persuade them to pay "fines" to avoid legal detection.

Williams personally benefited from his crimes. The Government was able to trace more than $600,000 in direct profits, which is a conservative sum given that Williams largely operated in cash. Notably, the fraud scheme appears to have been Williams's source of income for the duration of the conspiracy. As the PSR recounts, Williams reported no other employment after his career in the NBA ended. (PSR ¶ 227.) The loss amount attributable to Williams far exceeds that of any other charged defendant, and therefore represents the defendant's important, leadership, role in the scheme.

Williams's conduct also risked harming victim Plan participants. The Plan's benefits were fought for and obtained over the course of negotiations between the league and the NBA Players' Association. The defendant's fraud undermines trust in the Plan, the provision of Plan benefits, could chill the provision of benefits, and the construction of benefit programs. In addition, the defendant's conduct involved improper use of the tax treatment of Plan funds, which could risk the tax-free treatment applied to Plan reimbursements for all Plan Participants, including for legitimate claims. The defendant's conduct harmed the Plan, the NBA, and current, retired, and future NBA players and their families. Indeed, the scheme has already triggered administrative changes in how the Plan is administered to tighten controls and avoid future fraud.

General deterrence is also an important consideration in sentencing this defendant. The Court's sentence should make clear that healthcare fraud is serious, unacceptable, and should not be attempted. And as is clear from this case, it is all too easy to do what Williams and his co-defendants did, all too attractive, and all too difficult to detect until the fraud has reached a substantial scale. This means that a meaningful sentence is warranted. *See, e.g.*, *United States* v. *Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.' (quoting Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (alteration in original)); *United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of

Hon. Valerie E. Caproni
Page 14 of 14

(general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Francesco, Galbiati & Vertova, *The Deterrent Effects of Prison: Evidence From a Natural Experiment*, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

Specific deterrence is also relevant to the defendant. The defendant took part in this serious fraud and identity theft even *after* he knew the Plan was investigating his actions. Indeed, as explained above, on several occasions Williams took steps to continue the fraud and avoid detection. Then, when he was caught, and under the supervision of this Court, Williams threatened a Government witness. Given this background, and the fact that Williams appears to have lived off the proceeds of this fraud for years, a significant sentence is required to work to accomplish the ends of specific deterrence.

## III.    Conclusion

Williams bears unique responsibility and culpability for this sprawling fraud against the Plan. As the conspiracy's leader, orchestrator, and a chief benefactor, a significant sentence, within the Stipulated Guidelines Range, is necessary to adequately address the seriousness of the offense, promote respect for the law, and serve the interests of both general and specific deterrence. Accordingly, this Court should impose a sentence of 121 to 145 months' imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: */s/*_____
Ryan B. Finkel
Daniel G. Nessim
Assistant United States Attorneys
(212) 637-6612/2486